## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| HENRY M. RADE and NANCY MACDOUGALL, Individually And On Behalf Of All Others Similarly Situated, | ) ) ) ) |
| | ) |
| Plaintiffs, | ) ) |
| | ) |
| v. | ) ) |
| | ) |
| PITNEY BOWES INC., BRUCE P. NOLOP, MICHAEL J. CRITELLI, MURRAY D. MARTIN, THE EMPLOYEE BENEFITS COMMITTEE, CONNIE R. CAPERELLA and JOHN DOES 1-20, | ) ) ) ) ) ) |
| | ) |
| Defendants. | ) ) |

Civil Action No.

JURY TRIAL DEMANDED

December 11, 2009

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
## EMPLOYEE RETIREMENT INCOME SECURITY ACT

Plaintiffs, on behalf of the Pitney Bowes 401(k) Plan (the "Plan"), covering substantially all employees of Pitney Bowes Inc. and its subsidiaries (collectively, "Pitney Bowes" or the "Company"), individually and on behalf of all others similarly situated (the "Participants"), allege as follows:

### INTRODUCTION

1.      Plaintiffs bring this action on behalf of the Plan and all Participants and beneficiaries in the Plan to recover losses to the Plan for which the fiduciaries of the Plan are liable pursuant to Sections 409 and 502(a)(2) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1109 and 1132(a)(2). In addition, under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiffs seek other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, a constructive trust, restitution, equitable

tracing, and other monetary relief.

2. From October 31, 2006 through the present (the "Class Period"), the Plan acquired and held shares of Pitney Bowes common stock ("Pitney Bowes Stock" or "Company Stock"), which was offered as one of the retirement saving options in the participant contribution component of the Plan.

3. Defendants, each having certain responsibilities regarding the management and investment of the Plan's assets, breached their fiduciary duties to the Plan and Participants by failing to prudently and loyally manage the Plan's investment in Company Stock by, among other things: (i) continuing to offer Company Stock as a retirement saving option; (ii) continuing to acquire and hold shares of Company Stock in the Plan when it was imprudent to do so; (iii) failing to provide complete and accurate information to Participants regarding the Company's financial condition and the prudence of investing in Company Stock; and (iv) maintaining the Plan's pre-existing investment in Company Stock when it was no longer a prudent investment for the Plan.

4. As a result of Defendants' fiduciary breaches, as alleged herein, the Plan suffered substantial losses, resulting in the depletion of millions of dollars of the retirement savings and anticipated retirement income of the Plan's Participants. Under ERISA, the breaching fiduciaries are obligated to restore to the Plan the losses resulting from their fiduciary breaches.

5. Because Plaintiffs' claims apply to the Participants as a whole, and because ERISA authorizes Participants such as Plaintiffs to sue for plan-wide relief for breach of fiduciary duty, Plaintiffs bring this as a class action on behalf of all Participants of the Plan during the Class Period. Plaintiffs also bring this action as Participants seeking Plan-wide relief

for breaches of fiduciary duties on behalf of the Plan.

6.      In addition, because the information and documents on which Plaintiffs' claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiffs' allegations are by necessity upon information and belief.  At such time as Plaintiffs have had the opportunity to conduct additional discovery, Plaintiffs will, to the extent necessary and appropriate, amend the Complaint or, if required, seek leave to amend to add such other additional facts as are discovered that further support each of the following Counts below.

## JURISDICTION AND VENUE

7.      *Subject Matter Jurisdiction.*  This is a civil enforcement action for breaches of fiduciary duties brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a).  This Court has original, exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(l), 29 U.S.C. § 1132(e)(l).  In addition, this Court has subject matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the . . . laws . . . of the United States."  28 U.S.C. § 1331.

8.      *Personal Jurisdiction.*  ERISA provides for nation-wide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).   All of Defendants are residents of the United States, and this Court therefore has personal jurisdiction over them.  This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(l)(A), because they all would be subject to the jurisdiction of a court of general jurisdiction in this District.

9.      *Venue.*  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  Pitney Bowes is headquartered in Stamford, Connecticut.

## PARTIES

**Plaintiffs**

10.     ***Plaintiff, Henry M. Rade*** ("Rade"), is a former Pitney Bowes employee, a participant in the Plan, and held Pitney Bowes Stock in his portfolio during the Class Period.

11.     ***Plaintiff, Nancy E. MacDougall*** ("MacDougall"), is a former Pitney Bowes employee, a participant in the Plan, and held Pitney Bowes Stock in her portfolio during the Class Period.

**Defendants**

12.     ***Defendant, Pitney Bowes***, provides mail processing equipment and integrated mail solutions in the United States and internationally. Pitney Bowes offers a suite of equipment, supplies, software, and services for end-to-end mail stream solutions, which enable its customers to optimize the flow of physical and electronic mail, documents, and packages across their operations. The Company's Mail Stream Solutions group engages in the sale, rental, and financing of mail finishing, mail creation, shipping equipment, and software; and provision of supply, support, and other professional services, as well as payment solutions in the United States and internationally. The Company, formerly known as Pitney Bowes Postage Meter Company, was founded in 1920 and is headquartered in Stamford, Connecticut.

13.     ***Defendant, Bruce P. Nolop*** ("Nolop"), was, at all relevant times, Executive Vice President and Chief Financial Officer ("CFO") of the Company. During the Class Period, upon information and belief, Nolop was a fiduciary within the meaning of ERISA because he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

14. **Defendant, Michael J. Critelli** ("Critelli"), a director of the Company from 1997 until December 31, 2008, served as Chairman and Chief Executive Officer ("CEO") of the Company from 1997 until May 14, 2007, as well as its Executive Chairman from 2007 until December 31, 2008. During the Class Period, upon information and belief, Critelli was a fiduciary within the meaning of ERISA because he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

15. **Defendant, Murray D. Martin** ("Martin"), a director of the Company since 2007, has served as its President since October 2004, the Company's CEO and President since May 2007, and the Company's Chairman, President, and CEO since January 2009. During the Class Period, upon information and belief, Martin was a fiduciary within the meaning of ERISA because he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

16. **Defendant, the Employee Benefits Committee** ("Committee"), is, upon information and belief, comprised of certain Company employees/officers. The Committee is charged with the day-to-day management and administration of the Plan and/or management and disposition of the Plan's assets.

17. **Defendant, Connie R. Caperella** ("Caperella"), was, during the Class Period, the Plan administrator. Caperella also signed the Company's 2007 Form 5500. During the Class Period, Caperella was a fiduciary within the meaning of ERISA because she exercised discretionary authority or discretionary control with respect to the management of the Plan, she

possessed discretionary authority or discretionary responsibility in the administration of the Plan, and she exercised authority or control with respect to the management of the Plan's assets.

18. ***Defendants, John Does 1-20*** ("John Does 1-20"), are persons who had the duty and responsibility to properly appoint, monitor, and inform the members of the Committee (as defined above) and/or other persons who exercised day-to-day responsibility for the management and administration of the Plan and its assets. John Does 1-20 failed to properly appoint, monitor, and inform such persons in that these Defendants failed to adequately inform such persons about the true financial and operating condition of the Company or, alternatively, these Defendants did adequately inform such persons of the true financial and operating condition of the Company (including the financial and operating problems being experienced by Pitney Bowes during the Class Period identified herein) but, nonetheless, continued to allow such persons to offer Pitney Bowes Stock as an investment option under the Plan when the market prices of Pitney Bowes Stock was artificially inflated and when Pitney Bowes Stock was not a prudent investment for Participants' retirement accounts under the Plan. Liability is only asserted against each of these Defendants for such periods of time as these Defendants acted as a fiduciary with respect to the Plan.

19. The Defendants identified in paragraphs 13 through 18 above are collectively referred to herein as the "Plan Defendants."

## CLASS ACTION ALLEGATIONS

20. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following class of persons similarly situated (the "Class"):

> All persons who were Participants in or beneficiaries of the Plan at any time between October 31, 2006 and the present, inclusive (the "Class Period") and whose accounts held Company Stock or units in the Pitney Bowes Stock Fund, but excluding all Plan Defendants, and their heirs or successors in interest.

21.    The members of the Class are so numerous that joinder of all members is impracticable.  The exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery.

22.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants each owed a fiduciary duty to Plaintiffs and members of the Class;

(b)    whether Defendants breached their fiduciary duties to Plaintiffs and members of the Class by failing to act prudently and solely in the interests of the Plan's Participants and beneficiaries; and

(c)    whether Defendants violated ERISA.

23.    Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and the other members of the Class each sustained a diminution of vested benefits arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

24.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action, ERISA, and complex civil and commercial litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

25.     Class action status in this ERISA action is warranted under Rule 23(b)(l)(B) because prosecution of separate actions by the members or the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical manner, be dispositive of the interests of the other members of the Class to the actions, or substantially impair or impede their ability to protect their interests.

26.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecuting separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

27.     In the alternative, Plaintiffs request that the Court allow them to proceed under ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2).  Section 502(a)(2), 29 U.S.C. § 1132(a)(2) states that "[a] civil action may be brought -- by the Secretary [of Labor], or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title[.]"  ERISA Section 409(a), 29 U.S.C. § 1109(a), sets forth that:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable *to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary,* and shall be subject to such other equitable or remedial

-8-

relief as the court may deem appropriate, including removal of such fiduciary.

(Emphasis added).

## THE PLAN

**A.     The Plan**

28.     The Plan is an "employee pension benefit plan" as defined by §§ 3(3) and (3)(2)(A) of ERISA, 29 U.S.C. §§ 1002(3) and 1002(2)(A).

29.     The Plan is a legal entity that can sue or be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).

30.     In this action for breach of fiduciary duty, the Plan is neither a plaintiff nor a defendant.  Rather, Plaintiffs request relief for the benefit of the Plan and for the benefit of its Participants.

31.     The Plan is a "defined contribution" plan or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to the Participants' accounts, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which may be allocated to such Participants' accounts. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

32.     The Plan is a voluntary contribution plan whereby Participants make contributions to the Plan and direct the Plan to purchase investments with those contributions from options pre-selected by Defendants which are then allocated to Participants' individual accounts.

33.     The Plan Participants may invest their contributions and employer contributions in one or more of the investment options offered by the Plan.  Investment income, representing interest and dividends, and changes in the fair value of investments, are credited to each Participant on a daily basis based upon individual investment options selected.

34.     Pitney Bowes is the Plan Sponsor.

**B.     The Plan Fiduciaries**

35.     *Named Fiduciaries*.  ERISA requires every plan to provide for one or more named fiduciaries of the plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A).  The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator.  ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

36.     *De Facto Fiduciaries*.  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA § 402(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(I).

37.     Each of the Defendants was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and Participants under ERISA in the manner and to the extent set

forth in the governing Plan documents, through their conduct, and under ERISA.

38.    As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) to manage and administer the Plan and the Plan's investments solely in the interest of the Plan's Participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

39.    Plaintiffs do not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration. Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

## FACTUAL BASIS OF THE FIDUCIARY BREACHES

40.    In 1995, the U.S. Postal Service, with the cooperation of all authorized postage meter manufacturers, began a phase-out of all mechanical postage meters because of identified cases of indiscernible tampering and misuse. This first phase was followed by Phase II, an effort to retire electronic meters that were manually set by Postal Service employees. Phases III and IV involved the retirement of meters with non-digitally (electronic) printed indicia. This mandate involved non-digitally printing meters that are remotely reset under the Computerized Meter Resetting System ("CMRS"). The affected meters were those meters that print indicia using older letterpress technology rather than digital printing, even if they had a digital display. Phase III of the plan required that the users of non-enhanced CMRS letterpress meters be off the market and withdrawn from service by December 31, 2006. Phase IV of the plan required all enhanced

CMRS letterpress meters to be withdrawn from service by December 31, 2008.

41.    In 2001, Pitney Bowes adopted a formal plan to transition to the next generation of networked mailing technology.  The Company's reasoning was disclosed in its 2003 Form 10-K as follows:

> The information capture and exchange, made possible by advanced technology, turns the postage meter into an "intelligent" terminal that networks the mailer to postal and carrier information and systems.  This two-way information architecture, in turn, enables convenient access to and delivery of value-added services such as tracking, delivery confirmation and rate information.  The adoption of this plan was facilitated by our expanded access to technology and our ability to move to networked products combined with our expectations that the U.S. and postal services around the world will continue to encourage the migration of mailing systems to networked digital technologies.  As a result of this plan, certain electronic meter rental assets and related equipment will not be placed back in service.  In addition, certain leased equipment will either not be remarketed or will result in lower realization at the end of the lease as a result of the introduction of new technology.

42.    The progress of Pitney Bowes' transition to digital equipment was disclosed in its periodic filings with the U.S. Securities and Exchange Commission (the "SEC").  For example, at year end 2003, 2004, 2005, and 2006, Pitney Bowes disclosed that digital meters represented approximately 67%, 75%, 84%, and 93% respectively, of its U.S. meter base.  The issue was also discussed in conference calls.  For example, during the October 23, 2006 conference call, Critelli stated that "the meter migration of the Infinity Meters . . . will go through 2008."

43.    There was no question that, from the inception of the Class Period, Defendants knew that Pitney Bowes' technologically old equipment was rapidly being impaired and discarded.  However, during the Class Period, Defendants failed to recognize the charges to earnings associated with the write-downs that were required by generally accepted accounting

principles ("GAAP") a result of the asset impairments.

44.     On September 13, 2006, Pitney Bowes filed a Form 8-K with the SEC which

disclosed that, on September 12, 2006, Pitney Bowes held its 2006 Investor Update Meeting in

New York via a live conference and webcast.  This fiduciary communication contained an

appended press release, which stated:

> Pitney Bowes Inc. (NYSE: PBI) today provided investors with a
> road map for delivering revenue and earnings growth over the next
> five years.  The company gave financial outlooks for each of its
> seven business segments and committed to reducing its ratio of
> selling, general, and administrative expense to revenue from 31%
> to 28% by 2010.
>
> According to Chairman and CEO, Michael J. Critelli, the
> company's ability to establish long-term forecasts reflects the
> success of its growth strategies and operational programs, as well
> as the greater visibility afforded by the recent divestiture of its
> capital service business and the IRS tax settlement.  "We are
> clearly a different company today than we were five years ago," he
> noted, "we are now a 'pure-play' mailstream company and one-
> hundred percent focused on the opportunities in our core
> operations.  And given our recent strategic action relative to capital
> services, we are confident that we can continue to deliver our
> targeted results for the foreseeable future."
>
> The company said that it expects its revenue to grow organically by
> four to six percent and to sustain at least an eight to ten percent
> growth rate in its earnings per share.
>
> The company also provided specific guidance for 2007.  It expects
> revenue growth in the range of five to eight percent, which implies
> an organic revenue growth rate of four to six percent. It is
> forecasting earnings per share of $2.90 to $2.98 for 2007, which
> compares on a GAAP basis with a range of $2.47 to $2.56 for 2006
> -- an implied growth rate of around 13 to 21 percent.  Excluding
> restructuring charges and other special items, projected earnings
> per share for 2006 is $2.66 to $2.72 and, the company's guidance
> for 2007 represents a growth rate that is bracketed around its
> earnings per share target range of eight to ten percent.

> In addition to the financial projections, the meeting included strategic overviews for each of its business segments and an in-depth look at its U.S. Mailing business, including its successful management of the migration to digital mailing technologies.

45.     The dissemination of this press release caused the price of Pitney Bowes' Stock to climb from a closing price of $41.88 prior to issuance of the press release to a closing price of $42.04 after issuance of the press release. In the weeks that followed, the price of Pitney Bowes' Stock climbed higher.

46.     On October 24, 2006, Pitney Bowes filed a Form 8-K with the SEC. This fiduciary communication contained an appended October 23, 2006 press release announcing reported third quarter 2006 financial results. According to this press release: "For the third quarter 2006, revenue increased eight percent to $1.43 billion and income from continuing operations also rose eight percent to $144 million or $.64 per diluted share versus $.57 per diluted share for the prior year. This was a 12 percent increase in earnings per share over the prior year."

47.     Providing earnings guidance, the October 23, 2006 press release stated: "Earnings per share on a Generally Accepted Accounting Principles (GAAP) basis is expected to be $0.71 to $0.75 for the fourth quarter and $2.49 to $2.53 for the full year."

48.     The October 23, 2006 press release quoted Critelli as stating:

> This quarter we continued to enhance the strength and resiliency of our business model as we invested in growth opportunities, while improving operating efficiency. Our confidence in the sustainability of our results was underscored during the quarter as our revenue and earnings per share were again both within our targeted growth ranges. We believe the company is uniquely positioned to take advantage of the many large and growing opportunities in the mailstream.

\*   \*   \*

> The consistency of performance and enhanced visibility of our operating results after the sale of Capital Services allowed us to provide 2007 revenue and earnings guidance during our recent Investor Update meeting in September. This was the earliest we have ever provided guidance for an ensuing year.

49.    The September 12, 2006 press release and the October 23, 2006 press release were each materially inaccurate because Pitney Bowes failed to recognize impairment losses associated with its inventory and rental assets. In addition, Pitney Bowes failed to write down material amounts associated with the unguaranteed residual values assigned to its leased equipment. Moreover, the long term guidance which Defendants provided failed to include the effect of these impairment items.

50.    On September 25, 2006, Critelli sold 107,000 shares of Pitney Bowes Stock, realizing proceeds of approximately $4,929,000.

51.    In November 2006, Pitney Bowes issued $500 million of unsecured fixed rate notes maturing in January 2037.

52.    On February 5, 2007, Pitney Bowes filed a Form 8-K with the SEC. A February 5, 2007 press release appended to this fiduciary communication announced financial results for the three and twelve months ended December 31, 2006. The press release stated that income from continuing operations increased from $84 million in the fourth quarter 2005 to $163 million in the fourth quarter 2006, an increase of 95 percent, and that earnings per diluted share from continuing operations increased 101 percent from $.36 in the fourth quarter 2005 to $.73 in the fourth quarter 2006.

53.    Based upon this favorable news, the price of the Company's Stock increased from

$45.77 to $46.47 in heavy trading.

54.    On February 7, 2007, Martin disposed of 12,106 shares of Pitney Bowes Stock with a value of approximately $586,000.

55.    On February 9, 2007, Nolop sold 10,421 shares of Pitney Bowes Stock, realizing proceeds of approximately $505,000.

56.    Between February 9, 2007 and February 12, 2007, Martin disposed of 16,250 shares of Pitney Bowes Stock with a value of approximately $786,000.

57.    The February 5, 2007 press release was materially inaccurate because the reported results were materially overstated through Pitney Bowes' failure to recognize impairment losses associated with its inventory and rental assets, and material write-downs associated with the unguaranteed residual values assigned to its leased equipment.

58.    On October 29, 2007, after the market closed, Pitney Bowes filed a Form 8-K with the SEC. This fiduciary communication contained an appended October 29, 2007 press release announcing the fact that Pitney Bowes expected to report reduced earnings for the fourth quarter of 2007. During a conference call held that same day, Nolop presented guidance as follows: "For the fourth quarter, we are forecasting adjusted earnings per share of $0.67 to $0.71, which compares with $0.77 for last year. On a GAAP basis, we are forecasting fourth quarter earnings per share of $0.66 to $0.70, which compares with $0.73 last year."

59.    In announcing its expectation of reduced earnings for the fourth quarter of 2007, Pitney Bowes effectively admitted that it expected to record charges to earnings to reflect a portion of the above-described impairments that had been improperly deferred since the second half of 2006.

60.    The announced expectation of reduced fourth quarter earnings sent the price of Pitney Bowes' Stock into a tailspin. The price of Pitney Bowes' Stock, which closed at $46.99 prior to dissemination of the foreboding warning of decreased fourth quarter earnings, dropped in inordinately heavy trading to close at $39.93 after dissemination of the adverse news. Details concerning the write-downs were announced two weeks later.

61.    On November 15, 2007, Pitney Bowes filed a Form 8-K with the SEC. This fiduciary communication contained an appended November 15, 2007 press release in which the Company announced that it was initiating a global program to transition some of its product lines and that this initiative would result in "non-cash charges associated with the write-off of inventory and lease residuals of older equipment that the company will stop selling as it transitions to the new generation of fully digital, networked, and remotely downloadable equipment." Although Pitney Bowes had more than a year to compile the information, the November 15, 2007 press release did not provide numbers. Instead, it stated: "When the Company determines the range of these impairment charges, the appropriate disclosure will be made to provide this information."

62.    On February 29, 2008, Pitney Bowes filed its 2007 Form 10-K with the SEC. It stated: "We recorded . . . asset impairments [which] relate primarily to a program we announced in November 2007 to lower our cost structure, accelerate efforts to improve operational efficiencies, and transition our product line. The program includes charges primarily associated with older equipment that we have stopped selling upon transition to the new generation of fully digital, networked, and remotely-downloadable equipment. The asset impairment charges related to these initiatives include the write-off of inventory ($48 million), rental assets ($61 million),

-17-

lease residual values ($46 million), and other assets ($9 million)."

63.    Upon release of this information, the price of Pitney Bowes' Stock dropped.

## THE LAW UNDER ERISA

64.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

65.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

66.    ERISA § 404(a)(l)(A) and (B), 29 U.S.C. § 1104(a)(l)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

67.    These fiduciary duties under ERISA § 404(a)(l)(A) and (B) are referred to as the duties of loyalty, exclusive purpose, and prudence, and are the "highest known to the law." They entail, among other things:

(a)    the duty to conduct an independent and thorough investigation into, and

-18-

continually to monitor, the merits of all the investment alternatives of a plan, including, in this instance, the Plan, which invested in Pitney Bowes Stock, to ensure that each investment is a suitable option for the Plan;

(b)    the duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the Participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the Plan's sponsor; and

(c)    a duty to disclose and inform, which encompasses: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of Participants and beneficiaries.

68.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co-fiduciary," provides, in pertinent part, that ". . . [i]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly fails to disclose, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with section 404(a)(l), 29 U.S.C. § 1104(a)(l), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

69.    Plaintiffs therefore bring this action under the authority of ERISA § 502(a)(2) for

-19-

Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(l) and ERISA § 405(a).

<strong><u>DEFENDANTS' FIDUCIARY STATUS</u></strong>

70.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." § 402(a)(l), 29 U.S.C. § 1102(a)(l).

71.    During the Class Period, all of the Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A) and the law interpreting that section. As outlined herein, Defendants all had discretionary authority and control with respect to the management of the Plan and/or the management or disposition of the Plan's investments and assets, and/or had discretionary authority or responsibility for the administration of the Plan.

72.    During the Class Period, Defendants' direct and indirect communications with the Plan's Participants included statements regarding investments in Company Stock. Upon information and belief, these communications included, but were not limited to, SEC filings, annual reports, press releases, Company presentations made available to the Plan's Participants via the Company's website and the Plan-related documents which incorporated and/or reiterated these statements. Defendants also acted as fiduciaries to the extent of this activity.

73.    In addition, under ERISA, in various circumstances, non-fiduciaries who knowingly participate in fiduciary breaches may themselves be liable. To the extent any of the Defendants are held not to be fiduciaries, they remain liable as non-fiduciaries who knowingly participated in the breaches of fiduciary duty described below.

## CAUSATION

74.    Upon information and belief, the Plan suffered millions of dollars in losses in Plan benefits because substantial assets of the Plan were imprudently invested or allowed to be invested by Defendants in Pitney Bowes Stock during the Class Period, in breach of Defendants' fiduciary duties. These losses to the Plan were reflected in the diminished account balances of the Plan's Participants.

75.    Defendants are responsible for losses in the Plan benefits caused by the Participants' direction of investment in Pitney Bowes Stock, because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder. Defendants provided inaccurate and incomplete information to the Plan Participants regarding the true health and ongoing profitability of the Company, thereby misrepresenting the Company's soundness as an investment vehicle. As a consequence, Participants could not exercise independent control over their investments in Pitney Bowes Stock, and Defendants remain liable under ERISA for losses caused by such investment.

76.    Had Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in Pitney Bowes Stock, eliminating such Company Stock as an investment alternative when it became imprudent, and divesting the Plan from its holdings of Pitney Bowes Stock when maintaining such an investment became imprudent, the Plan would have avoided a substantial portion of the losses that it suffered.

77.     Also, reliance is presumed in an ERISA breach of fiduciary duty case. Nevertheless, to the extent that reliance is an element of the claim, Plaintiffs relied to their detriment on the misstatements and omissions that Defendants made to the Plan Participants.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

78.     Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been invested in Pitney Bowes Stock during the Class Period.  As a consequence of Defendants' breaches, the Plan suffered significant losses.

79.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary. . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ."  Section 409 also authorizes such other equitable or remedial relief as the court may deem appropriate . . . ."

80.     With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Participants and beneficiaries in the Plan would not have made or maintained their investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been properly administered.

81.     Plaintiffs and the Class are therefore entitled to relief from Defendants in the form of: (a) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting

from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3); (c) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (d) taxable costs; (e) interest on these amounts, as provided by law; and (f) such other legal or equitable relief as may be just and proper.

82.    Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plan in this case.

## CAUSES OF ACTION

### FIRST CLAIM:  INVESTMENT IN PITNEY BOWES COMMON STOCK (AGAINST ALL DEFENDANTS)

83.    Plaintiffs reallege and incorporate herein by reference the allegations set forth above.

84.    Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations, or duties imposed by ERISA § 404 shall be personally liable to make good to a plan any losses to that plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

85.    Pursuant to ERISA § 404, Defendants had a duty to discharge their duties with respect to the Plan solely in the interests of the Participants and for the exclusive purpose of providing benefits to the Participants.  Defendants' selection, monitoring, and continuation of the investment alternatives under the Plan were subject to the above-described fiduciary duties.  By

their continuing to offer Pitney Bowes Stock as an investment under the Plan, when Pitney Bowes's true adverse financial and operating condition was being concealed, Defendants breached each of these fiduciary duties.

86.     As a consequence of Defendants' breaches, the Plan suffered losses.

87.     Defendants are individually liable to make good to the Plan any losses to the Plan resulting from each breach.

88.     Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

### SECOND CLAIM:  MISREPRESENTATION AND NONDISCLOSURE (AGAINST ALL DEFENDANTS)

89.     Plaintiffs reallege and incorporate herein by reference the allegations set forth above.

90.     Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations, or duties imposed by ERISA § 404 shall be personally liable to make good to a plan any losses to that plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

91.     Pursuant to ERISA § 404, Defendants had a duty to discharge their duties with respect to the Plan solely in the interests of the Participants and for the exclusive purpose of providing benefits to the Participants.

92.     Defendants breached these fiduciaries in that they made material misrepresentations and nondisclosures as alleged above.

93.     The Plan Participants relied upon, and are presumed to have relied upon,

Defendants' material misrepresentations and nondisclosures to their detriment.

94.    As a consequence of Defendants' material misrepresentations and misleading omissions, the Plan suffered losses.

95.    Defendants are individually liable to make good to the Plan any losses to the Plan resulting from each breach.

96.    Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

### THIRD CLAIM: DIVIDED LOYALTY
### (AGAINST THE INDIVIDUAL DEFENDANTS ONLY)

97.    Plaintiffs reallege and incorporate herein by reference the allegations set forth above.

98.    Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations, or duties imposed by ERISA § 404 shall be personally liable to make good to a plan any losses to that plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

99.    Pursuant to ERISA § 404, Defendants had a duty to discharge their duties with respect to the Plan solely in the interests of the Participants and for the exclusive purpose of providing benefits to the Participants.

100.    Defendants breached their fiduciary obligations when they acted in their own interests rather than solely in the interests of the Participants and beneficiaries.

101.    As a consequence of these breaches, the Plan suffered losses.

102.    Defendants are individually liable to make good to the Plan any losses to the Plan

resulting from each breach.

103.    Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

### FOURTH CLAIM:  MISMANAGEMENT OF PLAN ASSETS<br>(AGAINST ALL DEFENDANTS)

104.    Plaintiffs reallege and incorporate herein by reference the allegations set forth above.

105.    Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations, or duties imposed by ERISA § 404 shall be personally liable to make good to a plan any losses to that plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

106.    Pursuant to ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), Defendants were required to discharge their duties with respect to the Plan solely in the interests of the Participants with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and of like aims, and to diversify investments in the Plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.

107.    Defendants breached these duties in that the Plan invested in Pitney Bowes Stock when the price of Pitney Bowes Stock was artificially inflated and when Pitney Bowes Stock was not a prudent retirement investment, thereby failing to diversify assets so as to minimize the risk of large losses.

108.    As a consequence of these breaches, the Plan suffered losses.

109.    Defendants are individually liable to make good to the Plan any losses to the Plan resulting from each breach.

110.    Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

### FIFTH CLAIM:  BREACH OF THE DUTY TO PROPERLY APPOINT, MONITOR AND INFORM THE COMMITTEE AND MEMBERS OF THE COMMITTEE (AGAINST THE MONITORING DEFENDANTS ONLY)

111.    Plaintiffs reallege and incorporate herein by reference the allegations set forth above.

112.    Upon information and belief, Nolop, Critelli, and Martin (the "Monitoring Defendants") had the duty and responsibility to properly monitor and inform the members of the Committee and/or other persons who exercised day-to-day responsibility for the management and administration of the Plan and its assets.

113.    The Monitoring Defendants failed to properly monitor and inform such persons in that the Monitoring Defendants failed to adequately inform such persons about the true financial and operating condition of the Company or, alternatively, the Monitoring Defendants did adequately inform such persons of the true financial and operating condition of the Company (including the financial and operating problems being experienced by Pitney Bowes during the Class Period identified herein) but nonetheless continued to allow such persons to offer Pitney Bowes Stock as an investment option under the Plan, even though the market price of Pitney Bowes Stock was artificially inflated and even though Pitney Bowes Stock was not a prudent investment for Participants' retirement accounts under the Plan.

114.    As a consequence of these breaches, the Plan suffered losses.

115.    The Monitoring Defendants are individually liable to make good to the Plan any losses to the Plan resulting from each breach.

116.    Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment and relief as follows:

A.      Determining that this action is a proper class action, certifying Plaintiffs as Class Representatives under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs' counsel as Class Counsel;

B.      Declaring that Defendants, and each of them, have breached their ERISA fiduciary duties to the Participants;

C.      Declaring that Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

D.      Ordering Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Participants would have made if Defendants had fulfilled their fiduciary obligations;

E.      Imposing a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

F.      Ordering Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in Pitney Bowes Stock;

G.      Awarding actual damages in the amount of any losses the Plan suffered, to be allocated among the Participants' individual accounts in proportion to the accounts' losses;

H.      Awarding costs pursuant to 29 U.S.C. § 1132(g);

I.      Ordering equitable restitution and other appropriate equitable and injunctive relief

against Defendants; and

J.    Ordering such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all causes of action so triable.

THE PLAINTIFFS

James E. Miller (ct21560)
Patrick A. Klingman (ct17813)
Shepherd, Finkelman, Miller & Shah, LLP
65 Main Street
Chester, CT 06412
(860) 526-1100
(860) 526-1120 (facsimile)
jmiller@sfmslaw.com
pklingman@sfmslaw.com

Seth D. Rigrodsky
Brian D. Long
Timothy J. MacFall
Rigrodsky & Long, P.A.
919 North Market Street, Suite 980
Wilmington, DE 19801
(302) 295-5310
(302) 654-7530 (facsimile)
tjm@rigrodskylong.com

Gregory M. Egleston (ct19709)
The Egleston Law Firm
360 Furman Street, Suite 443
Brooklyn, NY 11201
(646) 227-1700
(646) 227-1701 (facsimile)
greg.egleston@gmail.com

Their Counsel